William C. ROBINSON, et al.,
Plaintiffs, Appellants,

v.

POLAROID CORPORATION,
Defendant, Appellee.

No. 83–1619.

United States Court of Appeals,
First Circuit.

Argued March 5, 1984.

Decided April 25, 1984.

Jonathan Shapiro, Boston, Mass., with whom Lynn Weissberg, and Stern & Shapiro, Boston, Mass., were on brief, for appellants.

Mark S. Brodin, Boston, Mass., New England School of Law, and Marjorie Heins, Massachusetts Civil Liberties Union Foundation, Boston, Mass., on brief for the Civil Liberties Union of Massachusetts and the Lawyers Committee for Civil Rights Under Law of the Boston Bar Ass'n, amici curiae.

J. Harold Flannery, Boston, Mass., with whom Laurence S. Fordham, Sandra L. Lynch, Robert S. Sanoff, and Foley, Hoag & Eliot, Boston, Mass., were on brief, for appellee.

Before CAMPBELL, Chief Judge, BOWNES, Circuit Judge, and GIERBOLINI,[*] District Judge.

BOWNES, Circuit Judge.

The named plaintiffs in these consolidated actions are four black individuals who were laid off in 1974 from salaried positions by defendant Polaroid Corporation in the course of a substantial cutback in the company's work force due to economic conditions. On behalf of themselves and others similarly situated, plaintiffs sued in the United States District Court for the District of Massachusetts, alleging, *inter alia*, that the layoffs constituted race discrimination prohibited under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*[1] The district court certified a class comprising all black employees who were laid off in August to October of 1974 and were for that reason no longer employed by Polaroid. That class included hourly as well as salaried (*i.e.*, monthly) employees, even though the named plaintiffs fell exclusively into the latter category. Following a thirty-two day bench trial, the district court, 567 F.Supp. 192, found that the hourly layoffs were executed without racial bias in accordance with a long-standing seniority system, and that any adverse impact resulting from the seniority system was "unintentional and inevitable." With respect to the salaried layoff claims, the court found that plaintiffs failed to meet their burden of proof under either a discriminatory treatment or a disparate impact theory. The court therefore rendered judgment for defendants on all counts. On appeal, only the salaried layoff claims are in issue.

We begin with a summary of the layoff process for salaried employees as set forth in the district court's fact findings. Polaroid is divided into divisions, which are further subdivided into departments and subgroups of varying sizes. The company's top managers assigned layoff quotas to each division, and the division managers allocated their quotas among departments on the basis of the company's anticipated future operations and requirements. The initial layoff nominations were made by the manager of each operational unit—variously a department, a subgroup, or a small division—after consultation with senior supervisors. Company guidelines for the layoff decisions were set out in Polaroid's "Personnel Policy 250A," which reads in pertinent part:

> By necessity the process for an exempt [*i.e.* salaried] layoff must be less structured. Members in exempt classifications are not necessarily interchangeable. Each situation is different. Prior to a layoff decision, both job requirements and personal factors should be thoughtfully considered. The personal factors which should be considered include the particular knowledge and qualifications of the affected members and their seniority, past performance, future potential and ability to locate elsewhere.

These broadly phrased "personal factors," coupled with the decentralized structure of

---

[*] Of the District of Puerto Rico, sitting by designation.

**1.** Additional claims under Title VII and 42 U.S.C. §§ 1981 and 1983, concerning promotion practice and sex discrimination, were dismissed as untimely, and a fifth plaintiff's individual complaint of race discrimination was severed in 1980, leaving only the layoff claims for trial.

the layoff decisions, left individual managers with a considerable margin of discretion in interpreting and weighing specific factors. In general, managers made comparative ratings of employees and reached pragmatic decisions based on efficiency and particular skills. Each division manager was required to justify layoff decisions to the company's central management group, and each minority layoff was specifically reviewed on an individual basis. In twenty or thirty cases, changes were ordered at the divisional level, in each instance in favor of a black employee.

Personnel Policy 250A also articulated a policy of protecting employees with more than ten years of salaried seniority from layoff.

A member with substantial seniority, that is over 10 years of exempt service, should not be considered for layoff unless he/she is the least senior member in the classification in the division. Substantial seniority entitles a member to a job in the company during a layoff. However it may not be in the same classification or at the same level currently held.

The precise scope of the salaried layoffs, and their impact on black employees, remain unclear. Plaintiffs' and defendant's respective expert witnesses, Dr. Goldstein and Dr. Michelson, offered rival statistical analyses in a series of presentations and rebuttals. Although both experts derived their figures from a common set of Polaroid's employment records, they defined their data bases differently and applied different computer programs to the raw numbers, reaching predictably conflicting results.[2] The district court found Michelson's system more reliable. Moreover, after Michelson testified that Goldstein had made a fundamental error in applying his computer program, Goldstein admitted that if this were so, as it might be, "then, yes, I goofed." Finding that this admission fatally undermined plaintiffs' statistical evidence, the district court declined to make specific findings as to the company-wide or departmental/divisional figures for (a) total salaried employees before the layoff, (b) black and non-black employees effectively shielded from layoff by more than ten years of exempt seniority, or (c) black and non-black employees actually laid off. In general terms, the court did find that the proportion of black salaried employees dropped from 7.1% in June, 1974, to 6.0% after the layoff and then rose to 7.0% by the end of 1978.

On appeal, plaintiffs contend that the district court erred in ruling that, although they "proved a prima facie case, they were unable on any theory to satisfy their overall burden of proof."

We note at the outset that there appears to have been some confusion as to plaintiffs' theory of the case. The district court granted class certification with the express understanding that the layoff selection guidelines were being challenged exclusively under a "discriminatory treatment" rather than a "disparate impact" theory. At trial, plaintiffs' counsel elected not to make an opening statement, and nothing in the record indicates that plaintiffs were proceeding under a disparate impact theory with respect to the subjective standards until, on the fifth day, the issue came up in colloquy with the court. Plaintiffs' counsel argued that a disparate impact theory was applicable to the subjective standards as well as to the objective ten-year rule; and defendant's counsel argued that it was not. The court decided to hear evidence relevant to either theory, in order to give this court "a full bowl of fodder to chew" on appeal. Therefore, although plaintiffs now specifically claim that they should have prevailed on a disparate impact theory, we review the

---

**2.** The statistical experts disagreed in several fundamental respects concerning the following definitional factors: (a) the relevant date for measuring the number of employees before layoff; (b) the racial classification of employees listed as neither black nor white in Polaroid's records; (c) the measurement of layoff numbers on a company-wide as opposed to a departmental/divisional basis; (d) the number and significance of "voluntary layoffs"; and (e) the effect of employees "bumping" back to hourly positions for which they were qualified.

**1014**

district court's judgment under both standards.

■ The district court analyzed plaintiffs' claim "that defendant treated black salaried employees less favorably than white salaried employees in the layoff process" under the discriminatory treatment standard set forth in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Under *Burdine*, an individual plaintiff has the burden of proving a prima facie case of discrimination by a preponderance of the evidence. *Id.* at 252–53, 101 S.Ct. at 1093–94. The district court found that "[a]ll of the named plaintiffs and plaintiff class established a prima facie case by showing that they were black and laid off while white employees were not." Under *Burdine*, the defendant then assumes the burden of "articulat[ing] some legitimate, nondiscriminatory reason" for the action in question. *Id.* at 253, 101 S.Ct. at 1093, *quoting McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The district court found that Polaroid met this burden by introducing evidence that "each named defendant and class member had been carefully evaluated in comparison with other employees in the division or department," and that "other employees retained had superior performance records or more needed skills than the plaintiffs." Finally, in accord with *Burdine*, plaintiffs were given an opportunity to prove by a preponderance of the evidence that the defendant's articulated reasons were a pretext for discrimination; the ultimate burden of proving intentional discrimination remaining at all times with the plaintiffs. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093. The district court found that "[n]either individually nor as a class ... did the plaintiffs establish ... that the justification for layoff was pretextual or a sham or other than a good faith exercise of professional judgment." Absent a persuasive statistical showing to the contrary, the court drew the inference that "the performance evaluation was conducted in a racially neutral manner." The court's conclusion that plaintiffs failed to prove discriminatory intent, an essential element of any individual or class claim of discriminatory treatment, *id.*; *Pegues v. Mississippi State Employment Service*, 699 F.2d 760, 763 (5th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 482, 78 L.Ed.2d 679 (1983), *citing International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), is amply supported in the record.

■ Plaintiffs now assert that they also established a prima facie case under a disparate impact theory. Under *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), a Title VII plaintiff may prove a prima facie case of discrimination, without regard to intent, by showing that a "facially neutral employment practice ha[s] a significantly discriminatory impact. If that showing is made, the employer must then demonstrate that 'any given requirement [has] a manifest relationship to the employment in question,' in order to avoid a finding of discrimination." *Connecticut v. Teal*, 457 U.S. 440, 446–47, 102 S.Ct. 2525, 2531, 73 L.Ed.2d 130 (1982), *quoting Griggs*, 401 U.S. at 432, 91 S.Ct. at 854. We do not reach the issue of whether Polaroid made an adequate showing of business necessity, however, for the district court plainly found "no evidence of ... discriminatory impact in Polaroid's layoff program, either as applied in particular cases or viewed overall." The issue before us, therefore, is whether the district court erred in holding that plaintiffs failed to make a prima facie showing with respect to either of the challenged employment practices, namely, the layoff selection guidelines and the ten-year rule of Personnel Policy 250A. Because the disparate impact model "is not ... the appropriate vehicle from which to launch a wide ranging attack on the cumulative effect of a company's employment practices," *Pouncy v. Prudential Ins. Co. of America*, 668 F.2d 795, 800 (5th Cir.1982), we review the district court's holding with respect to each practice separately.

■ Plaintiffs' attack on the layoff selection guidelines relates to the margin of discretion or subjectivity inherent in the "personal factors" on which the evaluations were based. Plaintiffs point out that even the most objective factor, seniority, was suspectible of more than one interpretation,[3] and that the other factors—particular knowledge and qualifications, past performance, future potential, and ability to locate elsewhere—called for patently subjective evaluations which could easily mask covert or unconscious race discrimination on the part of predominantly white managers. *See Rowe v. General Motors Corp.,* 457 F.2d 348, 359 (5th Cir.1972). In passing, we note that it is by no means clear that claims of "excessive subjectivity" should *not* be analyzed exclusively under a discriminatory treatment rather than a disparate impact theory. *Compare Pegues,* 699 F.2d at 765 (treatment only); *Equal Employment Opportunity Commission v. Federal Reserve Bank of Richmond,* 698 F.2d 633, 638–39 (4th Cir.), *cert. granted sub nom. Cooper v. Federal Reserve Bank of Richmond,* —— U.S. ——, 104 S.Ct. 334, 78 L.Ed.2d 305 (1983) (same), *with Rowe v. Cleveland Pneumatic Co.,* 690 F.2d 88, 93 (6th Cir.1982) (either treatment or impact); *Bauer v. Bailar,* 647 F.2d 1037, 1042 (10th Cir.1981) (same). *See also Moore v. Hughes Helicopters, Inc.,* 708 F.2d 475, 481–82 (9th Cir.1983) ("there is some question as to whether [disparate impact analysis] may be applied at all to subjective employment decisionmaking," assuming, without deciding, that impact analysis applies). Indeed, it may well be that neither approach is fully applicable in conventional form.

The disparate treatment rules are designed for probing motivation with respect to an adverse action taken against a specific individual, and are ill-suited to a broad-based statistical attack on an entire employment system. Similarly, the three-stage adverse impact model is inapplicable since in an "excessive subjectivity" case, if adverse impact is established, there is no specific employment requirement such as a test or an education requirement which the employer can establish is job-related. Thus … the battle is determined by an evaluation of the probative force of plaintiff's and defendant's statistical evidence and the evidence with respect to alleged specific instances of discrimination.

Schlei & Grossman, Employment Discrimination Law 1288–90 (2d ed. 1983) (footnotes omitted). Although this court has adverted to the issue, noting that "[j]udicial tolerance of subjective criteria seems to increase with the complexity of the job involved," *Sweeney v. Board of Trustees of Keene State College,* 569 F.2d 169, 176 n. 14 (1st Cir.) *vacated on other grounds,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978), we have not been squarely confronted with a case requiring full consideration of the appropriate analytical framework; nor are we now. Because our decision today would be the same whether treatment or impact analysis applied, we hold only that plaintiffs fail, under both the former, as already discussed, and the latter, to establish a prima facie case of discrimination with respect to the layoff selection guidelines. To meet their burden under an impact theory, plaintiffs were required to prove "not merely … circumstances raising an inference of discriminatory impact," but "the discriminatory impact at issue." *Johnson v. Uncle Ben's, Inc.,* 657 F.2d 750, 753 (5th Cir.1981), *cert. denied,* 459 U.S. 967, 103 S.Ct. 293, 74 L.Ed.2d 277 (1982). They attempted to do this primarily through Goldstein's statistical analysis; the district court, however, found that Michelson's analysis indicating no disparate impact was "probably correct," and that Goldstein's admission of possible error effectively demolished plaintiffs' statistical showing. We agree that, in the absence of a persuasive statistical showing of actual discriminatory impact, the totality of the plaintiffs' evidence was inadequate to make out a prima facie case. This is not altered by the dis-

**3.** Some managers testified that they interpreted "seniority" to mean company seniority; others viewed it as exempt seniority; still others balanced the two on a case-by-case basis.

trict court's finding that the proportion of salaried blacks on a company-wide basis dropped from 7.1% to 6.0% after the layoff: these numbers do not reflect a divisional or departmental breakdown corresponding to the actual layoff process. *Cf. Moore*, 708 F.2d at 482–83 (differentiated labor pool requirement).

Plaintiffs' final claim concerns the "ten-year rule" of Personnel Policy 250A. The district court found that the rule had "no business justification ... that was not satisfied by the general inclusion of seniority as one of the criteria to be used in layoff decisions," and that, "although facially neutral, [the rule] had a potentially discriminatory impact on the plaintiff class because of the historical seniority patterns at Polaroid."[4] The court concluded, however, that "the ten-year rule did not have any impact on any of the named plaintiffs or the plaintiff class. There is no evidence that any of the plaintiffs were laid off because of the rule or would have escaped layoff if the rule did not exist." Plaintiffs assert that the district court impermissibly shifted to them the burden of proving causation as part of their prima facie case. They argue that they made a prima facie showing of discriminatory impact by establishing that there were proportionately fewer blacks than whites among the group of employees with more than ten years of exempt seniority, and that this raised a presumption in favor of the named plaintiffs and the class generally that the rule actually had an impact.

■ It is clear that the ten-year rule, like other specific, facially neutral employment selection criteria is amenable to disparate impact analysis. *See, e.g., Connecticut v. Teal*, 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982) (written test score); *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977) (height and weight requirements); *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) (high school diploma and

aptitude test). It is also clear that plaintiffs must show a causal connection between the application of the criterion in question and an alleged discriminatory impact on the protected class. *Pouncy v. Prudential Ins. Co. of America*, 668 F.2d 795, 800–01 (5th Cir.1982). Likewise,

> [w]here the disparate impact doctrine has been used by the courts in individual actions rather than class actions, a plaintiff has been required to show that he personally has been the victim of discrimination by the general practice which allegedly resulted in a discriminatory impact on a protected group. It is not sufficient for an individual plaintiff to show that the employer followed a discriminatory policy without also showing that plaintiff himself was injured.

*Coe v. Yellow Freight System, Inc.*, 646 F.2d 444, 451 (10th Cir.1981). In reviewing the district court's finding, therefore, we look at whether plaintiffs showed that the ten-year rule, "independent of other factors," caused a disproportionate number of black salaried employees, including the four named plaintiffs, to be laid off. *Pouncy*, 668 F.2d at 801.

■ The requisite causal link may not be inferred from the mere articulation of the ten-year rule in Personnel Policy 250A. First, the rule could be applied only in the context of layoff decisions, and these were made on a decentralized basis at the divisional, departmental, or subgroup level. Within any given operational unit, there might or might not have existed employees with more than ten years of exempt seniority as well as those with less. Unless both categories of salaried employees were present in the same unit, the ten-year rule could not be applied in the first place. Second, even in those units where the rule had potential applicability, it cannot be assumed as a matter of law that the rule had an effect independent of the layoff selection criteria. The layoff decisions that were made were necessarily determined by the

---

**4.** The district court found that the ten-year rule was arbitrary and lacked historical basis. Although it did not expressly hold that the rule

was not part of a bona fide seniority system protected under 42 U.S.C. § 2000e–2(h), we assume as much for present purposes.

selection guidelines, but they might perfectly well have been made in exactly the same way and with exactly the same results in the absence of the ten-year rule, especially in light of the "seniority" factor in the guidelines.[5] Our review of the record discloses only two references to possible applications of the ten-year rule. George Austermann stated that the rule "played a part in protecting some people from being declared surplus." He did not indicate whether this would have affected the layoff chances of any black employees. John Burgarella named one particular employee with more than ten years of exempt seniority whom he would have laid off but for the ten-year rule; he refused, however, to state that the employee would likely have been laid off in place of any member of the plaintiff class. On the other hand, at least seven managers (including John Rutter and John Gignac, testifying with respect to three of the four named plaintiffs) stated that the ten-year rule had no impact at all on their layoff decisions. On this evidence, we think the district court was correct in finding that the plaintiffs failed to make a sufficient showing to support a presumption of causation with respect to the named plaintiffs and the class generally. Thus, because plaintiffs made out no prima facie case, neither the burden of showing a manifest business necessity for the ten-year rule, nor that of disproving causation with respect to individual class members, ever shifted to defendant.

*The judgment for defendant on the individual and class action claims is affirmed.*

---

**5.** The underlying seniority system, as distinguished from Personnel Policy 250A, was not challenged as discriminatory. Although the district court did not specifically find that the system was protected under 42 U.S.C. § 2000e-2(h), it apparently assumed this was the case when it found the layoff selection guidelines to be nondiscriminatory.